[Civ. No. 8064. Second Appellate District, Division Two.—December 5, 1933.]

K. F. ROSS et al., Appellants, v. REAL ESTATE IN-VESTMENT COMPANY (a Corporation) et al., Respondents.

George Acret for Appellants.

C. E. McDowell and Howard F. Shepherd for Respondents.

ARCHBALD, J., *pro tem.*—September 30, 1929, plaintiffs filed their second amended complaint against defendants, alleging in substance that on February 8, 1927, the latter represented to plaintiff Ross that two certain lots in tract 9761, in Los Angeles County, belonging to them, were located at the corner of Avon Street and Burbank Boule-

vard, and that believing such representation to be true he agreed to purchase them; that on February 28, 1927, Ross executed a writing agreeing so to do, "believing and intending that the same covered and described" the two lots referred to; that he paid $4,594.80 on the agreed purchase price before discovering that said lots were not so located but were in fact located at the corner of Lima Street and Burbank Boulevard; that such discovery was made on or about May 15, 1929, and that on June 14, 1929, he rescinded said agreement; that on March 12, 1929, he assigned such agreement to his daughter, the plaintiff Matilda E. Bach, as security for a loan. An amendment was filed to such amended complaint setting up as a second cause of action not only the alleged representation relative to the location of said lots, but also alleged representations of defendants to the effect that contracts had been let for the immediate construction of one hundred homes in the vicinity thereof, that said houses were going to be constructed immediately, that a schoolhouse was to be built within a year a few blocks from said lots and would be ready for the following fall term, and other representations; that such representations were believed and the property purchased by said plaintiff in reliance upon them. The statements were alleged to have been false and to have been recklessly made, and allegedly known to defendants to have been false and untrue and recklessly made at the time they were made. The prayer of the amended complaint was for the return of the money alleged to have been paid on such purchase price. Both defendants filed answers denying the making of such representations, as well as denying the other material allegations of the complaint not admitted. The answer of defendant Security-First National Bank of Los Angeles also set up as a separate defense that plaintiffs were guilty of laches, and that of defendant Real Estate Investment Company that both causes of action were barred by the provisions of subdivision 1 of section 339 of the Code of Civil Procedure. Said Security-First National Bank also filed its cross-complaint against both plaintiffs for the balance due on said contract. The court made findings and entered judgment that plaintiffs take nothing by their complaint and that the cross-complainant Security-First National Bank recover of

and from cross-defendants the sum of $4,511.30. Plaintiffs and cross-defendants have appealed from such judgment.

Appellants contend that the court erred in making certain findings claimed to be not supported by the evidence, and in awarding a money judgment against them.

Respondent Real Estate Investment Company in 1926 and for several years thereafter was engaged in selling, among other properties, the lots in said tract 9761. Respondent Security-First National Bank held the legal title to said tract in trust for the various interested parties. One R. H. Strosnider was an agent employed by the investment company to sell the lots. The latter met appellant Ross in December of 1926 at Ross' office, and endeavored to interest him in buying lots in the tract. It is Ross' contention that he looked at the lots at the southeast corner of Avon Street and Burbank Boulevard, that he did not know anything about their legal description, that he became interested because they were only one block from an important thoroughfare and that he finally agreed to buy them. The lots said appellant claims to have agreed to purchase are numbered 107 and 108, the first being on the southeast corner of Avon Street facing Burbank Boulevard, and the second just east and alongside of it. To the east of lot 108 and parallel therewith are six lots each 25 feet in width, and parallel with and adjoining these to the east are lots 115 and 116, being on the opposite corner of the block from 107 and 108. Lots 115 and 116 are the ones described in the purchase agreement signed by Ross. On January 17, 1927, Ross and Strosnider executed a combination receipt and agreement to purchase lots 104 and 105 of tract 9761. It does not appear that the parties ever discussed such lots. The so-called receipt fixes the price of the lots at $8,100, but the blanks providing for payments to be made are not filled in. Written in one of them, however, is the acknowledgment of the receipt of two pieces of jewelry which Strosnider was to try to sell. The sale price, if satisfactory, was apparently to be applied as the first payment. Strosnider's explanation is that it was a temporary receipt for the jewelry rather than an agreement, and it is not satisfactorily explained by anyone how or why lot numbers were inserted therein.

On February 8, 1927, a receipt was executed by Ross and Strosnider acknowledging the deposit of $1.00 by Ross and "accepting one diamond ring and one diamond and opal *penant (sic)* in lavalier as the full down payment of $2,025." The total purchase price agreed to be paid by appellant Ross was $8,000, and the balance was to be paid in monthly installments of $105, with interest on deferred payments at seven per cent per annum. The agreement was conditioned on acceptance by the owner. Lots 115 and 116 were described therein. The evidence shows that the jewelry was not sold but was finally pledged by Ross and $700 in cash obtained, which was paid to Strosnider, and that Ross gave his note for $800, which he paid on May 28, 1927. The court found that $1,575 was paid in cash and that the agent waived $450 of his commission, which made the first payment of $2,025. February 28, 1927, Ross entered into a final contract for the purchase of said lots 115 and 116 with the Security Trust & Savings Bank, respondent bank's predecessor. On November 10, 1927, the trust department of the Security Trust & Savings Bank sent a notice to Ross reading in part as follows: "Payment will be due Nov. 15 on your contract—Note covering Lots 115 & 116, Tract 9761, as follows: Taxes for fiscal year 1927–1928, amounting to $48.63." This notice was stamped, "Received Payment Nov. 21, 1927", and was signed by the bank. It was introduced in evidence by plaintiffs as exhibit 11. Plaintiffs also introduced in evidence a receipt signed by appellant Ross dated July 14, 1927, reading as follows: "Received of Guaranty Office, Security Trust & Savings Bank, contract for Lots 115 & 116, Tract 9761."

The court found in effect that defendants did not represent that the lots which Ross agreed to purchase were located at the corner of Avon Street and Burbank Boulevard, but did represent that such lots were located at the corner of Lima Street and said boulevard, "at which point said lots were in fact actually located."

Appellants urge that there is no evidence conflicting with that of Ross to the effect that he picked out and agreed to buy the lots at the corner of Avon Street and Burbank Boulevard, and that he knew nothing about the numbers of such lots until more than two years after he had agreed in writing to buy the two lots actually located at the corner

of Lima Street. The evidence does not show any inadvertent insertion of lots 115 and 116 in such contract, and is only consistent with the fraudulent insertion of such numbered lots in the contract after respondent's agents discovered that the lots agreed to be bought by Ross had in fact been sold to someone else before the deal with Ross reached the closing stage. That was plaintiff's theory at the trial and is the only theory consistent with the evidence if appellants' position is correct. Opposed to the evidence of appellants as to the manner in which the lots were selected and Ross' lack of knowledge as to the lot numbers are the writings signed by the latter and which were in his possession during the period of two years and more, as well as the presumption that private transactions have been fair and regular (sec. 1963, subd. 19, Code Civ. Proc.), which presumption is itself in effect evidence and which the court had a right to find was not dispelled by the evidence in this case. In addition is the evidence of agent Strosnider to the effect that the school site was "directly" across the street from the lots selected by Dr. Ross, and the evidence that it is directly across from lots 115 and 116 and not so from the Avon corner lots; his denial that he stood with Dr. Ross on the corner of Avon and Burbank and told the latter "that was the corner"; that "all of the lot numbers indicated on these receipts (with the exception of the first one), were dealt with in his (appellant Ross') office and on the tract," and that he "left a map, to the best of my knowledge, with him . . . the first time I talked to him," which showed the "lots and blocks." That Strosnider actually had such map at the time of his visit to the office is clear from appellant Ross' testimony. During the latter's examination the following occurred: "Q. You mean to say that he (Strosnider) brought a map in and you wouldn't look at it because you were too busy? A. Absolutely. . . . Q. He had a map that showed the tract, but you were too busy to look at the lots he was selling? A. Why should I bother with a map? I didn't know whether I wanted to buy the property unless I saw it." The question of the weight to be given to the testimony of the various witnesses was for the trial court, as was the question of whether or not appellant Ross arrived at the decision to buy specific lots at his office or on the tract, and whether or not he knew the

numbers of the lots he actually bought; and in view of the record we cannot say that there is no substantial evidence to support the finding made.

■ The first writing, relative to the actual purchase of specific lots, was dated February 8, 1927; the final agreement was dated February 28, 1927. The date Ross claims to have first discovered the real location of the lots described in his contract is the latter part of May, 1929, the notice of rescission is dated June 14, 1929, and the original complaint herein was filed July 15, 1929. Over twenty-seven months intervened between the date of the contract and the attempted rescission, and over twenty-eight months before complaint was filed. The evidence shows without conflict that appellant Ross made frequent trips past the tract during such time, and he must have known that no buildings, or school buildings, were built or construction thereon started, either immediately or at all, complying with the alleged misrepresentation; and as we have said, in our opinion the evidence supports the finding that no misrepresentation was made as to location of the lots purchased. The receipts and contracts executed were at all times kept in Dr. Ross' desk in his office, and the court might well conclude that he had a map of the tract. No allegations are contained in the complaint in any way attempting to excuse the failure to discover the alleged fraud before said late date. Under such evidence the court found that appellants were guilty of laches.

■ "It is well settled that where a party has knowledge of facts of a character which would reasonably put him upon inquiry, and such inquiry, if pursued, would have led to a discovery of the fraud or other ground for rescission, he will be charged with having discovered the fraud or other ground as of the time he should have discovered it, that is, as of the time when he would have discovered it if he had with reasonable diligence pursued the inquiry when he should have done so". (*Bancroft* v. *Woodward,* 183 Cal. 99, 108 [190 Pac. 445, 449].)

Appellant, respondent Security-First National Bank and the trial court, evidently considered this to be an equitable action. There is evidence from which the court might well have concluded that sales in the locality kept up until 1929 and that appellant did not rescind until the demand for lots

had lessened, and that respondents were prejudiced by his delay in rescinding. If this is an equitable action, in our opinion the evidence amply supports the finding of laches.

■ The amended complaint, however, is based on an executed extrajudicial rescission alleged to have been made by plaintiff Ross. No demand is made for the exercise of any of the equitable powers of the court, but only for the recovery of the money· paid under the contract alleged to have been already rescinded. In our opinion it is not a suit in equity, but an action at law, and such finding is on an immaterial point.

■ Appellant urges that the representation was "that a contract was actually let for the immediate construction of one hundred houses," and not "that one hundred houses were immediately going to be built". We see little practical difference so far as affording notice to plaintiff, who, the evidence shows, passed by there frequently during the entire time after the contract was made. Respondents' answers admit that no such contract was let, although they deny that the representation was made. It is contended that Mr. Strosnider admits such statement. The only question he was asked was whether he recalled "saying anything about the houses being constructed there on the tract", to which he replied, "That may have been brought up that there were going to be houses built there, which there were three built, . . . I think in the spring or summer of 1927." It appears, however, from plaintiff's own testimony, that such conversation occurred after the final agreement of February 28, 1927, was executed, so we fail to see how it could have been any inducement to the contract. Plaintiff did testify that he went out alone to the tract in December, 1926, and heard a lecturer for a few minutes, and heard the same lecturer again with Strosnider, after signing the contract, and the court might well have concluded that he heard no such statement in December, 1926, or at any time prior to the signing of the contract, and in our opinion, even assuming that such a statement was made after the contract was signed, the finding made by the court referred to the statement alleged in the complaint, which was an inducement to the execution of the agreement, and in our opinion the evidence supports the finding that no such statement was made.

In view of the evidence showing the frequent passing of the lots by plaintiff during all the time and of his continued payments on the contracts, even though no houses or schoolhouses were built, in our opinion there is ample evidence to support the finding that appellant confirmed the contract after knowledge of the falsity of the alleged representations.

■ Appellant Bach, at the time of the assignment of the contract to her, in writing agreed "to fully perform said agreement according to its terms". Under and by virtue of such written promise the court gave judgment for the unpaid balance of said contract against both appellants. No tender of a deed was necessary before bringing suit for such unpaid installments under an express term of the agreement itself, which provides "that no tender or offer of performance by said seller shall be necessary as a condition precedent to its right to exercise any privilege, option or right hereunder, and that the same may be exercised upon any default of the buyer without such or any tender or offer of performance and without notice of any kind to said buyer". One of such rights is to accelerate the deferred payment in default of payment of any installment. The evidence shows that at the time the cross-complaint was filed appellants had defaulted on two monthly payments, viz., those of June 15 and July 15, 1929, and the court found that the respondent bank elected to and did declare the unpaid purchase price immediately due and payable, which was its right under said agreement.

■ Appellants urge that they were not in default, having rescinded and brought an action to recover the amount paid on the contract, and cite the case of *Roome* v. *Real Estate Inv. Co.*, 131 Cal. App. 496 [21 Pac. (2d) 599]. We fail to see that such case is in point here. In that case it was contended by defendants that plaintiffs had waived their right to damages by reason of their failure to make payments under the contracts, which provided that time of such payments was of their essence, and that the vendors had elected to declare the principal due and payable. This court there said (p. 557): "Under a claim of fraud in such a case the buyer will be permitted to withhold payment of the purchase price pending a suit for alleged damages, but must be willing and able to pay if and when liable therefor." In other words, there was no waiver of their

right to claim damages by reason of such failure to pay pending suit, and if the plaintiffs were successful and fraud were established, defendant was not in a position to claim forfeiture and plaintiff was justified, if fraud existed, "in withholding the payments to recoup the damages she would be entitled to recover" (*Pembrook* v. *Houston*, 41 Cal. App. 54 [181 Pac. 828]). The same is true here. If the court had found respondents guilty of fraud, then no right of acceleration or any rights under the contract would have existed; but a contrary finding having been made, appellants became liable to pay the amount which the court determined to be due under the contract.

All of the briefs were filed before the adoption of section 2, Rule VIII of the Rules for the Supreme and District Courts of Appeal, relative to statements of the questions involved on appeal being set forth in the briefs. Appellant inserted seven such questions in his opening brief. Some of them are very complicated and cannot be answered "yes" or "no", and we think they are fully covered in this opinion.

Judgment affirmed.

Stephens, P. J., and Craig, J., concurred.